Good morning. I am Jared Parker, here representing Omega Healthcare. The District Court erred in two primary respects here. One, the Vernon case should not have been extended to the present facts. And two, even if it should have been, it was misapplied. With regard to the first point, because Vernon involved funds that were payable to the government, not to private parties, the interests of the government were at stake. Sorry. And as a result, state law that was contrary to those interests was preempted. Our case involves funds that were payable to private parties. No rights of the government were implicated. Well, the statute does require and the government did pay the money to the successor. So that's between the government and the program agreement holders. The government's only obligation was to pay the operator, the event operator, right? Correct. So that's really kind of by the boards in either case. The question is what happens to the money after that? That's correct. And that gets to my second point, that in this case Vernon was misapplied. And my reason for that is that Vernon, if you accept Vernon's reasoning, if you accept that it should be applied to this case as well, Vernon did not take the prior owner, the prior owner of the facility, and remove that party from the liability picture. It didn't say, all right, your liability has been transferred to the new owner. It imposed joint and several liability. Well, let's accept all that and that this is probably a contract case. Now, tell me, in the agreement, what language do you rely on? There are you must look at the structure of the agreement. The answers or the assets that were being transferred were specified. There were a list of specific items. The facility itself, numerous books and records, contracts, et cetera. There was no mention of the transfer of accounts receivable, whether they be from Medicare or whether they be from nongovernment sources. This is sort of odd because it's an account receivable where the account is going to be paid to the successor, unlike other situations. In other words, the money is going to get into the hands of the successor, no doubt about it. So calling it an account receivable is a little odd. Usually it means that the obligation is to pay the original person, but that's not the obligation of the third party. The third party here, its obligation is not to pay the original person, it's to pay the second person. Right. And it comes down to the obligations between the two nongovernment parties here and the contract by not conveying to the new owner any rights to receivables at all, retains the prior owner retained any rights that existed. Now, admittedly, everyone realized that that would likely be paid to the holder of the provider number, and that was the reason for the second part of the contract to which I was going to refer, the language giving the prior owner access to the books and records to be able to monitor collection of receivables to which it was entitled. And that is the actual language in the contract. It refers to receivables to which the prior owner would be entitled. Now, back to the the exact language. Did you ask where it is or what it is? What it is. I've got the thing right in front of me, so just tell me. The, again, as to the first part, there is no language. There's just no mention of the asset being transferred. With regard to the second point, the access to the books and records, it gives Raintree, well, let me get access, and this is a quote, to verify accounts receivable collections due debtor Sunquest, and that is Sunquest, not Suncrest, and for reimbursement purposes for the cost reporting periods prior to and including the effective date, the, which reflects the anticipation of the parties, and this is not unusual when a business is sold that there might be receivables and prior accounts coming in subsequently that will have to be reconciled and paid over pursuant to contractual obligations. Does that? Do we have anything in the record about what percentage of the patients in this location were being paid for by Medicare? I don't believe so, and I do not know the answer to that. It's of some relevance because assuming that there were some who were not or that some of what their costs were not being paid by Medicare but by insurance, then this section about the ability to access records would still have a function, even if it didn't refer to the Medicare. That's true, Your Honor, although I believe the language, reimbursement purposes for the cost reporting periods, that seems to me language that is taken from the Medicare program. All right. Those are cost reporting periods are the language used by Medicare when they do their audits and refer back, but certainly it has effect with regard to receivables other than Medicare receivables, and that reflects the overall intent of this contract. Isn't the basic question here really what's the default rule? And, I mean, Judge Silver was quite specific. She recognized that there could be a contract that did this, but she thought there had to be expressed language. And I don't know where she got that from, but ultimately that's the question. How specific language does one need to demonstrate an intent in the face of this unusual fact that the government is going to pay number two, that number two has to pay number one? How definite does that have to be in the contract? Is that really our question? I would suggest it is, Your Honor, assuming we've gotten past the Vernon point. And in an instance like this, I would submit that it was clear to the parties what would be happening, and when you have a contract that is structured with only specific designated assets being transferred, that it is not necessary to go beyond that and specify what is not being transferred, particularly when the intent is otherwise reflected in other language where the parties are reserving their rights to. But the real problem here is that for all we know, there was there any monetary transaction between these two parties? There was just a lease and then a second lease, and these two parties actually didn't pay anybody anything. Is that right? I'm sorry, any. These parties had no financial interaction. Is that correct? I'm not sure, Your Honor. I assume there was consideration paid for the transfer of the facility, but I. But they didn't. Was there or was. My understanding is that one of them just terminated the lease and the other one began a lease with a third party. That was part of it. And then there was the, that was with regard to the lease, and certainly that was called for by the transfer agreement. Well, this agreement doesn't require anybody to pay anybody anything. That's true, Your Honor. And perhaps it just came down to a basic allocation of. That's actually very important, actually in your favor, because it suggests that there ordinarily you would think, well, maybe the cost of the receivables was in the purchase price, but there was no purchase price. So why would they begin to get away for free? I would agree. And what the structure of this deal that we can see from the agreement is that Rain Tree retained any obligations that arose prior to the sale period, but also retained the right to receivables and benefits from prior to that period. And on the other hand, Suncrest took on any obligations and would receive the benefit going forward, obligations including paying lease payments going forward, taking over obligations under the lease, but then, of course, being able to recover from the income of the property going forward. It was a transfer designed to maintain operations for the benefit of the patients. With regard to your question about how specific one has to be, I believe the various state law cases cited establish the fact that terms, sometimes even critical terms, can be read into a contract when necessary to give it effect, and that the intent of the parties, of course, is critical. And I would submit again that their intent is reflected in the overall structure of the agreement, as well as the specific language granting access to review the records. I would just like to finish, in case it is relevant to your decision on the point about the application of Vernon to these facts, or the misapplication, Vernon provided for joint and several liability, which essentially meant it just gave the government another party to go after. It didn't tell the first party, okay, you can leave the table, you're scot-free. The government could collect from either of the parties at its choice and then leave those two parties to their contractual rights to allocate under normal concepts of reimbursement and indemnity who was ultimately responsible. If one were to properly apply Vernon, and again, I would suggest it cannot be applied here, there is no basis to argue that the prior owner comes away with nothing. That a parallel to joint and several liability, though there is no such thing, would be joint and several entitlement, where the government can pay the party of its choice and then leave the two parties pursuant to their contractual rights to sort out who is really entitled, which brings us back to the questions you've been asking in the focus on the contract. If that is what the case comes down to, Vernon has no impact. One other point, I believe it is clear and undisputed that in the absence of a transfer of ownership, pre-petition, pre-bankruptcy petition rights to Medicare receivables are assets of the estate. I don't think we need to really explore that further. I just want to point out some time was spent in the briefs addressing that. There is not another issue there. If you're past the Vernon issue and if you agree that pursuant to the contract, Omega, as successor to Rain Tree, is entitled to the funds, I don't believe there is any other question about all the cases dealing with property of the estate and whether Medicare receivables become part of that estate. In summary, and I'd like to save the rest of the time, I think that the entire argument of Suncrest, in this case, comes down to application of Vernon. Even in their discussions of the contract, every point comes back to the fact that whatever the intent was, Vernon controls. And that despite the intent, despite what the contract may say, as a matter of law, the money goes to the new owner. And as I indicated earlier, I think it is clear Vernon does not apply. And even if we were to look to the terms of the contract, and again, Suncrest does not, in my reading of the briefs, attack that, except to the extent Vernon overrides it. The fact is that the contract provides that the money would go to Rain Tree and ultimately Omega. And I would like to reserve the rest of my time. Thank you. Thank you. Counsel? Good morning. I'm Scott F. Gibson on behalf of Suncrest. If this case didn't involve Medicare transaction with the transfer of the Medicare provider number, it might be a different situation. But that's why we asked. Clearly what the transfer of the Medicare provider number means is that the government was going to pay the successor. But that – what does that tell us about who gets the money as between the original operator and the second operator? I think you start with the assumption that it goes to the person to whom it's paid, unless there is something that would transfer that away from the person, from, in this case, Suncrest. Let me ask you something. Is it true that this agreement has no financial piece to it at all? That is correct. What happened – So your ultimate position is that the – I hadn't realized that. So your position is that the original operator essentially gave you $500,000? No, Your Honor. For no reason? For no money? But no consideration? Number one, I don't know where the $500,000 comes from. Whatever the amount of money is, I don't know. The number was $185,000. What has also occurred in this case is that because we assumed the provider number and became responsible for the violations that were in place, Suncrest, on the day that it took over the facility, had to deal with government regulators who ended up assessing $250,000 in fines and compliance issues that were taken care of. But the agreement does say that Suncrest is going to remain liable. Now, they're in bankruptcy. It's true. So we got – essentially, the $185,000 that we got almost partially pays back the amount of money that we had to pay because of Raintree's operation of the facility. That's how this statute is applied. That's why the regulations and the statutes contemplate that the funds go to the provider number. Let's say that Raintree was overpaid and the government is asking for funds back. Would your client have been obligated to make that payment? Absolutely. That's what Vernon holds. That's what the regulations hold. That's what the statutes hold. We would have been obligated to pay for any overpayments. Because we're obligated to make those overpayments, we're also entitled to receive the benefit of any underpayments. But you would theoretically have been able to go against Suncrest. The problem is that Suncrest was in bankruptcy. Yes. But the contract does make clear that Suncrest remained liable for it. The problem is that they're in bankruptcy. It does state that. But, again, as the practical matter here, that would be of no effect. Now, it's important that we put this in context of how this transaction occurred. We now have the benefit of looking back five years after the fact. But when this transaction went down, what happened was that Raintree knew that it was in dire financial straits, knew that it had patients, residents that it needed to care for, and in the space of a day or two, this transaction was put together so that these residents would not be thrown out on the street. At that time, no one had any idea whether there would be overpayments or underpayments that would need to be accounted for. The parties bore the risk of having that be resolved as they went forward. Now, Raintree was supposed to pay debts that had accrued up to the date of the transfer? That's what it says, yes. Raintree was supposed to, but if there had been overpayments, the government would have come looking to Suncrest to make those payments back. That's what Vernon holds. That's what the regulations are. And as between Raintree and your client, if that had happened, if Raintree hadn't been in bankruptcy, they could have sought, Suncrest could have sought from Raintree a payment of that amount. Is that not correct? If there had been no bankruptcy, but everyone knew the bankruptcy was going into effect as of the time that they entered into this agreement. But theoretically, that obligation would have been Raintree's. Theoretically, it would have been, to whatever extent it could have paid. So here comes the overpayment. Why isn't that Raintree's? The underpayment? The payment that was made to Suncrest. The payment made to Suncrest? Uh-huh. Because the statute and the regulations transfer those payments to Suncrest. Nothing in the agreement says that any payments that Suncrest receives by operation of law now go to Raintree. So the real question is where the – this was the assumption on which the district court was operating. That is a sort of plain words argument, that there had to be an explicit statement in the contract that Suncrest nonetheless remains the owner of that receivable, so to speak. Where would we get that rule from, that there needs to be the sort of a plain words kind of a rule like that, a contract law? I think that's general contract interpretation. Why not? That a contract means what it says. Well, this one doesn't say – you at least have to agree that this contract says nothing about this. It says nothing about it. I mean, it either says something from which one can assume something, which is the provision about the records, but it says nothing directly. Correct. It says nothing directly. And if the parties intended that, if they intended that the funds Suncrest received by operation of law were to go to Raintree, then they would have said that. That's standard. It doesn't have any assertion. It doesn't have any – to me, it's a – But that's standard. That's what I thought the parties would have done. You'd have to know something about the industry and what was standard in the industry and so on, which we don't know. Well, and these parties are both players in the industry. Right. And we don't know what either of them meant, but that's the problem. But had they intended for something different than the regular procedure in the industry, they would have contracted for that. One of the things that occurs to me listening to you is that your assumption about the fact that because you're picking up the liabilities, you must be getting the overpayments because of the bankruptcy. In fact, if the overpayments went to Raintree, it would go into the bankruptcy, right? And then you could make a claim in the bankruptcy for the underpayments. So in that sense, I don't know if there were other creditors, so I don't know whether you'd get cents on the dollar or whether you'd get the whole thing, but you'd at least get something. Well, the only problem on that is that Omega has already taken all of the assets of the bankruptcy. Those were all assigned over to Omega. So if you are to follow through with this. I'm looking at it prospectively. I mean, from your assumption that they must have intended the overpayments to go over the underpayments because you would have to pay the underpayments in the first instance and other possibilities, they thought it would all wash out in the bankruptcy. I don't know that we can assume that from the agreement. I don't think there's enough evidence one way or another. Well, the approach of the bankruptcy judge was that in determining who's entitled to these funds, we set aside the fact that there was a bankruptcy. We just look at the obligations between the parties, which seems like a reasonable approach to the problem. It may lead to some inequity. I'm not suggesting that it might not, but it seems to me that as between the parties say there'd been no bankruptcy, that the obligation would have been obligations for underpayment would be on the green tree and that the right to reimbursement would be theirs also. The problem with that analysis is that it ignores the statutes and the regulations under Medicare, which make those payments go to Suncrest. I'm not terribly impressed, unless you tell me why I should be, with the notion that because the government decides for its administrative convenience to pay X, that tells us anything much about the ultimate ownership of the money. I guess I don't know why it wouldn't, because the government in the Vernon line of cases and under the statute talks about the Medicare provider number being ‑‑ let me frame it this way. The Medicare provider number is the ticket that you need to play in the Medicare game. And without that, the government won't make any payments. And so the holder of that provider number has certain benefits and certain obligations. That's why in Vernon and in the Dearborn case that we cited, the successor to the provider number was still obligated to do those things that the predecessor was required to do. The provider number is the key to Medicare's system. What if the contract were very clear that the payments were to go to Raintree? Would you still assert that the regulations would trump that? I guess it depends on when you ‑‑ at what point in time those payments were to go to Raintree. If the contract were to say that the ‑‑ that any payments made to Suncrest under the provider number go to Raintree, then I think Raintree would get them as a matter of contract. But first you would go under the regulations, because the regulations and the statutes do trump the private agreement between the parties. That private agreement has to be interpreted in the context of the existing law. And Arizona law is real clear on that. We interject the statute and the regulations into the contract of the parties. But it doesn't say ‑‑ it says the payment will go to the person who holds the provider number. Yes. It doesn't say what happens thereafter. It doesn't say that it goes away. And nothing says that that payment leaves the person holding the provider number. Nothing in the contract or otherwise. Well, I understand your argument that the provider number trumps everything. But the reasoning of the bankruptcy judge, and I'm looking at the record at 121, number two, it seems to me the contract provisions which allow the owner to come back subsequently and examine books and records for a reasonable time period would have little meaning if indeed there was not a need to get this additional information to, in order to deal with and apply for, seek reimbursement from these earlier periods. Now, that's the substance of what the bankruptcy judge based its ruling on. And what's wrong with that reasoning? Well, what's wrong with the reasoning is that he never got to the point of saying that the funds go to Suncrest by operation of law. He ignored the statutes and the regulations that have those funds. Everybody knows it went to Suncrest or went to Suncrest. That's where it went. That's who has it. And there was no reason to belabor that. The question is what does the contract mean to be saying about who keeps it? Well, and the point is the contract doesn't say that it transfers away. And now the question was asked earlier of were there other patients, the non-Medicare patients. The answer is yes. Although primarily these were Medicare residents in the facility, there were non-Medicare people involved. And so those would be regular accounts receivable that would be analyzed under that situation. But Medicare is a different and unique situation. Well, the question was asked about, you know, what percentage of the income of this facility was Medicare. As a practical matter, probably most of their income was Medicare, was it not? I believe that is correct. Isn't that pretty much the situation in those institutions? Much of it. I don't know what percentage, but much of it is. Is your opponent correct when he says that the term for cost reporting periods prior to and including the effective date is a repetition of Medicare regulation language? I believe that is. But what you also have to read in there is the provision just before that where it says something to the effect of payments to which Raintree is entitled. And you have to read that into the provision. Raintree wasn't entitled to those payments because those payments were to go to Suncrest. It depends what the contract says, whether they're entitled or not entitled. Well, I think you can. It's a very intriguing, I mean, little puzzle sort of case. Anything else? We think that the specific situation involving Medicare law here makes this a different situation than it otherwise would be, and we ask that. It's certainly a different situation. If it wasn't for that, there wouldn't be any question. There wouldn't be an issue. It would not have been an issue. No. But we ask you to affirm the decision of the district court. Thank you. Thank you. With regard to the perhaps equitable arguments of what Suncrest might be facing because of the fact that Raintree went into bankruptcy, that doesn't have any impact on the contract itself or what the parties intended. It may lead to unfortunate consequences. It may not. Bankruptcies often lead to recoveries. Often they don't. But in this case, there's nothing in the record that reflects that Suncrest faces any liabilities here. In fact, the record reflects that all the cost reports for Medicare for all the prior periods we're in, the only and the result is a net payment back. Suncrest is not facing any liabilities here, even if they were. It's not an equity argument. It's a question of construing the contract in light of the fact that there was no money change at hand here. So one has to try to figure out what the consideration is on both sides in order to get some sense of what this contract's really about.  And I think the ñ I mean, certainly a factor here was to maintain the operation of the facility, but in terms of consideration, what Suncrest got was a running facility they could take over, turn key, walk in, and start getting the benefits of it. And with regard to the division was, anything prior is either belongs to or is the obligation of Raintree and anything subsequent goes to Suncrest. And to the extent they have any sort of setoffs, which is what was suggested here, they could still be asserted, whether ñ against these funds that they're holding. But we have not heard of any. Ultimately, is this a factual or legal question, what this contract means? We have the Bankruptcy Court. That's theoretically the finder of fact here. And he read the contract in one way. And the district court, in light of the governing regulations, read it another way. Is that a fact or is this all a legal issue that we decide is a matter of law? Certainly, the application of Vernon is a legal issue with regard to what the contract  Right. And ultimately, the reason it's ultimately a contract question with the Vernon background, what is it, a legal issue or a factual issue? I believe it's a legal issue. I ñ it's an interesting combination, perhaps, but ultimately, I think it's a legal issue. And one final point, you asked about the interpretation of the contract. That's clearly the focus here. And another rule of contract interpretation is that under Arizona law, in particular, subsequent conduct can reflect the intent of the parties as well. And I would refer you to excerpt of record, page 71, which is the letter from Suncrest to the bankruptcy trustee after this money was received, indicating that the money would be turned over subject to two issues that had to be worked out. One was the potential for subsequent requirements of Medicare to pay money back. And the other was a small matter that's really not relevant. But I think that letter is another important factor that could be taken into account and was in determining what the intent of the contract was. And unless you have any further questions. Thank you, counsel. Thank you. The case of Rain Tree Healthcare v. Omega Healthcare is submitted.
judges: B .Fletcher, Gibson , Berzon